UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHANA DUONG,<br><br>    Plaintiff,<br><br>v.<br><br>POLLY KAISER, et al.,<br><br>    Defendants. | Case No. 25-cv-07598-JST<br><br>**ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Re: ECF No. 4 |

Before the Court is Petitioner Rachana Duong's motion for a preliminary injunction. ECF No. 4. The Court will grant the motion.

## I.   BACKGROUND

### A.   Factual Background

Duong, who is a native of Cambodia, was admitted into the United States as a refugee at five years old and became a legal permanent resident retroactive to February 19, 1980. ECF No. 1 ¶¶ 19, 24; ECF No. 1-1 at 8 (Duong Decl.); ECF No. 13-1 ¶ 6 (Li Decl.). He and his family fled the Khmer Rouge genocide, which affected them deeply. ECF No. 1 ¶ 24. After arriving in the United States, Duong, his mother, and his siblings were abandoned by Duong's father and subsequently abused by his mother's new partner. *Id.* Duong often felt rejected by his mother. ECF No. 1-1 at 8 (Duong Decl.). In his youth, Duong struggled with trauma from the violence he had experienced, racist bullying, and financial insecurity, including homelessness. ECF No. 1 ¶ 24.

Duong fell in with a group of friends who supported themselves through criminal activities, which increased in seriousness as they aged. *Id.* ¶ 25. When Duong was 19, he and two friends committed a robbery which led to the unintentional death of an elderly woman. *Id.* Duong

was subsequently convicted of first-degree murder and grand theft with a gang enhancement under California Penal Code § 186.22, for which he was sentenced to twenty-five years to life and three years in prison, respectively. *Id.*; ECF No. 13-1 at 2-3 (Li Decl.).

After serving 26 years of his sentence, Duong was granted parole and released from criminal custody in March 2020. ECF No. 1 ¶ 26. As part of the parole application process, a clinical psychologist determined via a Comprehensive Risk Assessment that Duong represented a low risk of reoffending. *Id.* In recommending Duong's release from prison, the parole board also considered Duong's conduct while in prison and the opinion of the District Attorney's office. *Id.*

Upon release from criminal custody pursuant to the grant of parole, Duong was immediately arrested by ICE. *Id.* ¶ 27. He spent the next three months, from March to June 2020, in ICE custody at Yuba County Jail in "the worst conditions [he had] ever experienced." *Id.* ¶¶ 2, 27. There were feces on the walls and under the mattress and urine on the floor, which he was required to clean. *Id.* ¶ 27. Detainees were psychologically, emotionally, and physically abused by guards, faced "lack of medical care, broken hygiene facilities, unsanitary conditions including mold and insects, spoiled food, and excessive use of solitary confinement," and were not given access to phones or mail. *Id.* Amidst these conditions, Duong's fragile mental and physical health deteriorated. *Id.* ¶ 28. His asthma and other medical conditions worsened, he developed symptoms of depression and PTSD, and he experienced hallucinations reminiscent of the genocide in Cambodia. *Id.*

On June 2, 2020, Duong was released from ICE custody pursuant to the bail application process established by the court in *Zepeda Rivas v. Jennings*, a class action challenging conditions at the Yuba County Jail and another facility on COVID-related grounds. ECF No. 1 ¶ 29; *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 40–41 (N.D. Cal. 2020), *aff'd in part and ref'd to mediation*, 845 Fed. Appx. 530 (9th Cir. 2021). The *Zepeda Rivas* release process took care "both to avoid releasing detainees who are a danger to the community and to minimize the possibility that detainees will fail to appear." *Id.* ICE released Duong on an order of supervision, installed an electronic ankle monitor on his person, and placed him in a monitoring program through ICE's Intensive Supervision Appearance Program ("ISAP"). *Id.* Under the settlement agreement

reached in *Zepeda Rivas*, ICE agreed to forgo re-detaining Duong or his fellow class members for three years following the approval of the settlement "unless they pose[d] a threat to public safety or national security, and/or risk of flight." *See Zepeda Rivas*, No. 20-cv-2731-CV, Dkt. No. 1205-1 at 13 (Subsection III.A).[1] The three year period elapsed on June 9, 2025. ECF No. 13 at 8.

Since his release from ICE custody, Duong has complied fully with the terms of his bail order and monitoring requirements. *Id.* ¶ 30. In recognition of that compliance, ICE de-escalated Duong's conditions of release and removed his ankle monitor in June 2022. *Id.* Duong last reported for an in-person check-in with ISAP on August 21, 2025. ECF No. 4 at 5. Duong was also released from parole a year early for good behavior. ECF No. 1 ¶ 30.

Duong has spent his free years serving his family and community, working on his health, and pursuing his rights in his immigration proceedings. *Id.* ¶ 31. Since 2021, Duong has been gainfully employed by community organizations that provide essential services to vulnerable community members facing mental health and financial challenges. *Id.* ¶ 32. "He has dedicated his life post-release to his community, helping ensure people are able to access essential services safely and without fear." *Id.* In his current role, he works from 4 p.m. to 12 a.m.—"the most demanding shift of all"—providing services to individuals struggling with active substance use and severe mental health issues. *Id.* "During this time, he often addresses the majority of client behaviors and incidents independently, utilizing his training and skills to provide effective support." *Id.* "Clients feel comfortable approaching him with their concerns, and he consistently maintains this trust." *Id.*

Duong is the primary caretaker for his elderly mother, who has severe medical conditions and has been on dialysis since her kidneys failed four years ago. *Id.* ¶ 33. He takes care of her basic needs, provides emotional support, and takes her to weekly dialysis appointments. *Id.* Duong also houses and provides financial support to his nephew. *Id.* In the past five years, Duong has been able to receive consistent care for his own health conditions, including weekly allergy shots and other medications. *Id.* ¶ 34. He is currently seeking treatment for a partially

---

[1] The Court grants the request for judicial notice of certain filings from *Zepeda Rivas*, ECF No. 14.

collapsed lung. *Id.*

Since he was released from ICE custody in 2020, Duong has also diligently pursued his rights in his immigration proceedings. *Id.* ¶ 35. After Duong moved successfully in 2024 to terminate removal proceedings due to a defect in the notice to appear, the Department of Homeland Security filed a second notice to appear, initiating proceedings that Duong is currently litigating. *Id.*; ECF No. 13 at 8.

On September 6, 2025, an ICE officer knocked on the front door of Duong's home. ECF No. 1 ¶ 36. Stating that there had been an issue with Duong's mandatory photo submission to ISAP, the officer asked him to step outside to retake the photo in order to avoid a citation. *Id.* When Duong complied, he was arrested by additional ICE officers who had been waiting out of sight. *Id.* ICE then refused to communicate with Duong's attorney, who repeatedly attempted to learn where he had been taken. ECF No. 1 ¶ 37; ECF No. 4 at 11; ECF No. 15 at 6. Duong similarly made repeated requests to speak with his attorney, which were denied. ECF No. 15 at 6. When Duong was arrested, he had tested positive for COVID two days prior and was experiencing acute symptoms. ECF No. 4 at 12; ECF No. 15 at 6.

Duong now "states that 'the pain of being taken from [his] home with no information and no access to [his] lawyer after trying so hard to do everything right to keep fighting [his] case' and after working so hard 'over the last 28 years since [his] criminal convictions to turn [his] life around and be a better person' 'is indescribable.'" ECF No. 15 at 6–7 (citing ECF No. 15-1 at 4 (Duong Decl.)). He finds himself repeatedly questioning "why he was treated this way" and "is consumed by thinking about what happened" to him, "worrying about what will happen to his job, his mother, and his nephew if he is abruptly detained again." *Id.* at 7.

B.  **Procedural History**

On September 6, 2025, the same day that he was arrested, Duong filed a petition for writ of habeas corpus and a motion for temporary restraining order. ECF No. 1. Later that day, this Court granted the TRO until September 20, 2025 and set a briefing schedule. ECF No. 6 at 5.

4

1  ICE released Duong from custody that evening. ECF No. 10. The Government[2] filed an

2  opposition on September 12, 2025, ECF No. 13, and Duong filed a reply on September 15, ECF

3  No. 15. The Court held a hearing on the motion on September 19, 2025.

## II.  LEGAL STANDARD

The Court applies a familiar four-factor test on both a motion for a temporary restraining order and a motion for preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A plaintiff seeking either remedy "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winters v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Where the plaintiff does not establish a likelihood of success on the merits but merely establishes "serious questions going to the merits," a preliminary injunction may still issue if the plaintiff can show that the balance of hardships "tips sharply in [his] favor," irreparable injury is likely, and the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

## III.  DISCUSSION

The Court finds that issuance of a preliminary injunction is justified because "serious questions going to the merits" exist, irreparable harm to Duong is likely, and the balance of hardships tips sharply toward him. *See All. for the Wild Rockies*, 632 F.3d at 1135.

### A.  Likelihood of Success on the Merits

Duong argues that the Due Process Clause of the Fifth Amendment to the United States

---

[2] The Court gives notice that Judge Tigar maintains a social relationship with Pamela Johann, the Chief of the Civil Division of the United States Attorney's Office. The United States Attorney has previously assured Judge Tigar that in any case pending before him, Ms. Johann will have no supervisory or other responsibility for the case, and those responsibilities will be transferred to the Acting Civil Chief of the United States Attorney's Office.

5

Constitution entitles him to a hearing before a neutral adjudicator before he can be re-detained. "In order to analyze a procedural due process claim, [courts] engage in a two-step analysis" which first "determine[s] whether the [detainee] was deprived of a constitutionally protected liberty or property interest" and then "examine[s] whether that deprivation was accompanied by sufficient procedural protections." *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022); *see also Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). The Court finds that Duong has shown, at a minimum, that serious questions exist as to the merits of this claim.

### 1. Liberty Interest

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Civil detention, including that of a non-citizen, violates due process in the absence of a "special justification" sufficient to outweigh one's "'constitutionally protected interest in avoiding physical restraint.'" *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)) (internal quotation marks omitted).

This interest in freedom from detention remains highly salient for individuals, like Duong, whose release is subject to termination. In *Morrissey v. Brewer*, the Supreme Court held that an individual whose parole is revoked—who, like Duong, is re-detained after being released—has a "valuable" liberty interest notwithstanding the "indeterminate" nature of his freedom. 408 U.S. 471, 482 (1972). Subject to the conditions of his release, a noncitizen released on bond "can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id*. The parolee's liberty therefore "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often others." *Id*.

In *Young v. Harper*, the Supreme Court held that individuals placed in a preparole program intended to reduce prison overcrowding had the same liberty interest as the parolees in *Morrissey*, requiring pre-deprivation process. 520 U.S. 143, 146–47 (1997). Analyzing the "nature of the interest of the parolee in his continued liberty," the Supreme Court concluded that a preparolee's interest was like a parolee's interest in all relevant ways because "he was released from prison

6

before the expiration of his sentence," "kept his own residence," "sought, obtained, and maintained a job," and "lived a life generally free of the incidents of imprisonment." *Id*. at 148. The fact that the preparolee's liberty was subject to more burdensome limitations did not distinguish *Morrissey*. *Id*. at 148–50, 152.

Applying *Morrissey*, district courts in this circuit have found that a noncitizen at liberty has a greater interest in remaining free from detention than does a noncitizen who is currently or was recently detained. For instance, in *Guillermo M.R. v. Kaiser*, a noncitizen who was previously detained and subsequently released on bond petitioned for habeas to prevent his rearrest. No. 25-CV-05436-RFL, 2025 WL 1810076, at *1 (N.D. Cal. June 30, 2025). The court concluded that "[j]ust as the liberty interests of a parolee who is re-arrested differ from the interests of an inmate who seeks to have a parole board review the terms of his incarceration, Petitioner has asserted liberty interests that differ from the liberty interests of a detained person." *Id*.

And in *Carballo v. Andrews*, a noncitizen petitioned for habeas in circumstances nearly identical to Duong's. In requiring the government to conduct a bond hearing, that court concluded that there is "a meaningful distinction between a challenge to an initial period of detention . . . and a challenge to *re-detention* after a court has previously granted release on bond pending immigration proceedings." No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *4 (E.D. Cal. Aug. 15, 2025). The court there contrasted an individual detained immediately upon release from criminal custody, who "has no opportunity 'to form the [] enduring attachments of normal life,'" with an individual who has spent time free from physical restraint. *Id*. (quoting *Morrissey*, 408 U.S. at 482).

The Government argues that Duong cannot establish a viable liberty interest because his prior release resulted from a settlement agreement which only prohibited his re-detention for a fixed period of time. *See* ECF No. 13 at 12–13. But while the settlement agreement has expired and no longer mandates his release, neither can it reasonably be interpreted to waive or diminish Duong's rights. *See, e.g.*, *Zepeda Rivas*, No. 20-cv-2731-CV, Dkt. No. 1205-1 at 21 ("Nothing in this Agreement shall have any preclusive effect on . . . any claim by . . . any Class Members concerning any individual challenges to the legal basis of their custody, now or in the future.").

7

When the settlement expired, Duong was left with the rights afforded him by the immigration statutes and the Due Process Clause of the Fifth Amendment, which he now asks this Court to adjudicate.

The Court finds persuasive the Eastern District of California's reasoning in *Carballo*, which also involved a *Zepeda Rivas* class member and confronted this exact issue:

> The government points to the circumstances of petitioner's release in 2020—as a result of a class action regarding conditions of confinement during COVID—in arguing that a protected liberty interest was not created by petitioner's five years on release status. But although the government was precluded by the settlement agreement from re-detaining petitioner until June 2025, the government could have expedited petitioner's removal proceedings at any time during those five years. Instead, it chose to allow petitioner's proceedings to continue for five years while he reintegrated into the community and now asks for petitioner's circumstances during those five years on release to be disregarded. Petitioner was released in 2020 based on criteria including that he did not pose a flight risk or a danger to the community. The government does not argue that anything has changed in either respect, while, for five years, petitioner established ties in the community. Those circumstances are appropriately considered on petitioner's due process challenge.

No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *5.

The Government also suggests that Duong can have no liberty interest in his continued freedom because the statute under which he is subject to detention—8 U.S.C. § 1226(c)—makes such detention mandatory. *See* ECF 13 at 13–14. Section 1226(c) mandates detention of noncitizens who are inadmissible or deportable because they have committed certain crimes or have links to terrorism, but who are not yet subject to final removal orders. The provision takes effect "when the [noncitizen] is released" from criminal custody. 8 U.S.C. § 1226(c). A parallel provision not at issue here, 8 U.S.C. § 1226(a), provides for discretionary detention and applies to any noncitizen whose removal proceeding is pending.

But an individual may have a protected liberty interest in maintaining his freedom even where that freedom is contrary to law. In *Johnson v. Williford*, the Ninth Circuit considered an inmate who had been erroneously released on parole despite being ineligible for parole. 682 F.2d 868, 873 (9th Cir. 1982). The court held that returning the inmate to incarceration would be inconsistent with due process and "fundamental principles of liberty and justice" because the

8

premature release had been "through no fault of his own, and [he] had made a good adjustment to society." *Id*.

Other courts in this district have found that individuals subject to detention under section 1226(c) have a protected interest in remaining at liberty even though section 1226(c) detention is mandatory. In *Perera v. Jennings*, the noncitizen, who had not been detained despite having been subject to section 1226(c) since his release from criminal custody six years prior, sought a bond hearing prior to his arrest. 598 F. Supp. 3d 736, 739 (N.D. Cal. 2022). The court held that Perera had a liberty interest protected by the Due Process Clause. *Id*. at 745. In fact, because Perera had not been taken directly from criminal custody into immigration detention, his liberty interest went "far beyond that present in a typical detention situation under § 1226(c)." *Id*. at 744. Unlike the typical section 1226(c) detainee, Perera had spent six years after his release taking classes, building a career, getting married, and having a child. *Id*. The fact that Perera was six years overdue for immigration detention did not diminish his liberty interest, but increased it. The same is true for Duong.

## 2.    **Procedural Protections**

In deciding what procedural process is due, the Court considers the factors set forth in *Mathews v. Eldridge*: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335 (1976).[3]

As numerous courts have found, all three *Mathews* factors support requiring a hearing before a noncitizen released from immigration detention can be re-detained, even where detention is mandatory. *See, e.g.*, *Meza v. Bonnar*, No. 18-cv-02708-BLF, 2018 WL 2554572 (N.D. Cal.

---

[3] The applicability of the *Mathews v. Eldridge* test to bond hearings in the immigration detention context is not fully settled in this circuit. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1207 (9th Cir. 2022) ("assum[ing] without decid[ing] that Mathews applies" to determine whether due process requires a bond hearing for certain detained noncitizens). However, courts within this district have uniformly applied that test in deciding whether noncitizens are entitled to bond hearings. This Court follows suit.

June 4, 2018) (bond hearing required before noncitizen can be re-detained under 8 U.S.C. § 1226(c)); *Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019) (same); *Vargas v. Jennings*, No. 20-CV-5785-PJH, 2020 WL 5074312 (N.D. Cal. Aug. 23, 2020) (bond hearing required before bond can be revoked on the grounds that noncitizen was subject to section 1226(c), not section 1226(a) as the IJ had believed when initially granting bond); *Singh v. Andrews*, No. 1:25-CV-00801-KES-SKO (HC), 2025 WL 1918679, at *2 (E.D. Cal. July 11, 2025) (bond hearing required before a noncitizen can be re-detained under 8 U.S.C. § 1225(b), which provides for detention during expedited removal proceedings).

As discussed above, freedom from detention is at the heart of the liberty interest that the Due Process Clause protects, so the private interest at stake in detention cases is always paramount. *See Zadvydas*, 533 U.S. at 690. And Duong's particular circumstances make his private interest even stronger. He has "a substantial private interest in remaining on bond to continue to provide care and financial support for his family," including his ailing mother and his nephew. *Vargas*, No. 20-CV-5785-PJH, 2020 WL 5074312 at *3; ECF No. 1 ¶ 33. He also has a substantial private interest in avoiding the trauma he has previously suffered in ICE detention and the health challenges he would face there, including aggravation of his asthma, difficulty receiving treatment for his collapsed lung, and a more difficult recovery from his COVID infection. *See id.* ¶ 34. Finally, the loss of Duong's contributions to his employer would be "devastating" and would "deeply affect both staff and clients." *Id.* ¶ 32; ECF 5 at 19–20.

The efficiency burden entailed by a bond hearing would be minimal. As other courts have observed, bond hearings require little expenditure of resources. *See Henriquez v. Garland*, No. 5:22-CV-00869-EJD, 2022 WL 2132919, at *5 (N.D. Cal. June 14, 2022); *Singh v. Barr*, No. 18-cv-2471-GPC-MSB, 2019 WL 4168901, at *12 (S.D. Cal. Sept. 3, 2019); *Hilario M.R. v. Warden, Mesa Verde Det. Ctr.*, No. 1:24-CV-00998-EPG-HC, 2025 WL 1158841, at *9 (E.D. Cal. Apr. 21, 2025). Moreover, the Government has not argued—nor could it, in light of Duong's spotless record since his release from detention—that the delay attributable to a hearing would risk flight or harm to others.

The remaining factor is the risk of erroneous deprivation and the procedure's value in

preventing error. Civil immigration detention serves two permissible purposes: to prevent flight or to protect against a danger to the community. *See Zadvydas*, 533 U.S. at 690. Bond hearings in the immigration context therefore assess whether detention is necessary to mitigate flight risk or protect the community from harm.

A pre-deprivation hearing before a neutral decisionmaker is "one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). Where the petitioner does not receive a hearing, "the risk of an erroneous deprivation [of liberty] is high" because neither party "has had an opportunity to determine whether there is any valid basis for [the petitioner's] detention." *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *5 (N.D. Cal. July 24, 2025) (quoting *Singh v. Andrews*, No. 1:25-CV-00801, 2025 WL 1918679 (E.D. Cal. July 11, 2025)) (cleaned up). The government's unilateral determination that re-detention is warranted is far less likely to be correct than the decision reached by a neutral adjudicator in a bond hearing. *See Diouf v. Napolitano*, 634 F.3d 1081, 1092 (9th Cir. 2011) ("[T]he risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial.").

The Government nonetheless argues that no bond hearing is required, drawing on the Supreme Court's decision in *Demore v. Kim*, 538 U.S. 510 (2003). There, the Court upheld mandatory detention under section 1226(c), rejecting the plaintiffs' argument that section 1226(c) detainees should receive bond hearings. *Id.* at 514, 516. The Court reasoned that Congress crafted the statute in response to evidence that individuals subject to detention under section 1226(c) fail to appear in significant numbers before they can be removed. *Id.* at 519–20. Because the political branches are afforded leeway in managing immigration, Congress's categorical determination concerning flight or dangerousness overrode any need for an individualized determination to that effect. *Id.* at 521–22, 531.

As Duong argues, however, *Demore* involved a facial challenge and its holding left open the possibility of successful as-applied challenges. *Demore* did not address the rights of an individual in Duong's unique position, but rather addressed post-detention bond hearings for individuals who had not previously been released. Here, the issue is not whether individuals

11

detained for a short time under section 1226(c) are entitled to a bond hearing, *see Demore*, 538 U.S. at 528, but whether individuals previously detained under section 1226(c) and then released are entitled to a hearing before re-detention. As discussed above, that period of release modifies the requirements of due process because it increases the weight of the liberty interest.

In a subsequent decision, the Supreme Court explicitly opened the door to as-applied challenges to section 1226(c) stemming from the increased liberty interest of those who have been free from detention for significant periods of time. In *Nielsen v. Preap*, the Supreme Court considered whether the text of 1226(c) applied to individuals who had been free from criminal custody for many years, in addition to those who have just been released. 586 U.S. 392, 396 (2019). Although the Court held that the text did not contain any such limit on the scope of section 1226(c), it "emphasize[d]" that the respondents' arguments "ha[d] all been statutory." *Id*. at 419. The Court's "decision . . . on the meaning of that statutory provision [did] not foreclose . . . constitutional challenges to applications of the statute." *Id*. at 420.

Courts in this district have taken the Supreme Court's invitation and found that an individual who enjoys a lengthy period of freedom after release from criminal custody may not be detained pursuant to 1226(c) without a hearing. In *Perera*, discussed above, the court distinguished *Demore* to hold that due process entitled a noncitizen released from criminal custody six years before immigration officials detained him under section 1226(c) to a bond hearing. 598 F. Supp. 3d at 743–44, 748. Another court in this district followed suit in *Pham v. Becerra*, likewise holding that due process required bond hearings for individuals who had been at liberty for several years and were subsequently detained under section 1226(c). No. 23-CV-01288-CRB, 2023 WL 2744397, at *4–7 (N.D. Cal. Mar. 31, 2023).

Duong's case is different from Perera's and Pham's only in that he was detained pursuant to section 1226(c) briefly after release from criminal custody and *then* released. As the Eastern District noted in *Carballo*, this makes Duong's case stronger, because his initial release was attributable to an individualized determination that he was not a flight risk or a danger to his community. No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *6.

In contrast, the petitioners in *Perera* and *Pham* were found entitled

12

> to a post-deprivation bond hearing even though they had not previously been granted release pending immigration proceedings. This case presents a stronger due process concern because there has already been a court determination that petitioner did not present a flight risk or danger to the community, and respondents do not present any evidence of any change in these circumstances.

*Id*. Again and again, state actors have evaluated Duong and found that he did not pose a risk of flight or harm to others: when he was granted parole, when he was released from immigration detention pursuant to the order in *Zepeda-Rivas*, when he was released from parole early, and when ICE de-escalated his conditions of release and removed his ankle monitor. See ECF No. 1 ¶¶ 26, 29, 30; ECF 4 at 20–21.

*Demore* allowed Congress's categorical determination that significant numbers of section 1226(c) detainees were likely to be a flight risk or danger to supplant individualized determinations. But it did not address the requirements of due process for noncitizens who in fact received such individualized determinations and were therefore released. For these individuals, an adjudicator has in fact decided that the hazards immigration detention is intended to mitigate or avoid—flight risk and danger to the community—simply are not present. Allowing Congress's categorical determination to override their due process right to a hearing on re-detention would be illogical.

Where an individualized assessment of flight risk and dangerousness has been made and bond granted, courts follow the Board of Immigration Appeals in requiring a "material change of circumstances" before bond can be revoked or modified. *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981); *see, e.g.*, *Meza*, No. 18-cv-02708-BLF, 2018 WL 2554572, at *3 (holding that where a noncitizen was detained under section 1226(c) and released, "due process would seem to require an administrative hearing to show a material change in circumstances" before she can be re-detained). Because Duong was released pursuant to a finding that he was not at risk of fleeing or harming others, due process prevents him from being re-detained except upon a showing of a material change in circumstances.

The parties dispute the burden of proof and evidentiary standard applicable at a bond hearing. But the Ninth Circuit has repeatedly held that due process requires the government to prove by clear and convincing evidence that a noncitizen facing detention is a flight risk or danger

13

to the community. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1199 (9th Cir. 2022) (summarizing Ninth Circuit opinions—and calling them into question on other grounds—which hold that due process requires that the government to bear the burden of proving, by clear and convincing evidence, that a noncitizen poses a risk of flight or dangerousness before he can be detained). The Government offers no authority to the contrary.

Duong, who was released pursuant to an individualized risk determination, is not properly subject to Congress's categorical determination concerning section 1226(c) detainees, which was crucial to the outcome in *Demore*. He also has a heightened liberty interest due to his prolonged period of freedom. Under these circumstances, all three *Mathews* factors support imposing a hearing requirement. He has established at least a serious question going to the merits.

### B.   Irreparable Harm

The Court finds that Duong is likely to suffer irreparable harm in the absence of a preliminary injunction. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Moreover, the Ninth Circuit has recognized in "concrete terms the irreparable harms imposed on anyone subject to immigration detention" including "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez v. Sessions*, 872 F.3d 976, 995–96 (9th Cir. 2017).

Duong is highly likely to suffer concrete irreparable harms upon re-incarceration, related to the mental and physical health challenges he faces, including a potentially still-active COVID infection and a collapsed lung. Additionally, considering Duong's traumatic experience in ICE custody in 2020 and underlying mental health conditions, every day that Duong spends in detention puts his mental health at risk of deteriorating like it did in 2020. Finally, Duong's incarceration would deprive his nephew of financial support and potentially his home. It would also deprive his mother of her sole caretaker, potentially impairing her ability to receive dialysis and otherwise maintain her fragile health.

14

### C. Balance of Equities and the Public Interest

Finally, the balance of the equities and the public interest tip sharply in Duong's favor. These factors "merge where, as is the case here, the government is the opposing party." *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As the court in *Diaz v. Kaiser* recently concluded:

> The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering. . . . Without the requested injunctive relief, Petitioner-Plaintiff might be abruptly taken into ICE custody, subjecting both him and his family to significant hardship. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted.

No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (citation modified).

### D. Security

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). The Government does not argue that the Court should require Duong to give security, and indeed, has no plausible argument that it will be harmed by a bond hearing requirement. Accordingly, Court finds that no security is required here. *See also Diaz v. Kaiser*, 2025 WL 1676854, at *3.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

15

**CONCLUSION**

For the reasons explained above, Duong's motion for a preliminary injunction is granted. The Government is enjoined from arresting, detaining, or removing Duong without notice and a hearing to determine whether a material change of circumstances justifies his re-detention.

**IT IS SO ORDERED.**

Dated:  September 19, 2025

_____
JON S. TIGAR
United States District Judge